Ben M. Harrington (SBN 313877)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: benh@hbsslaw.com

Steve W. Berman (*pro hac vice forthcoming*)
Theodore Wojcik (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com

*Counsel for Plaintiff and the Proposed Class*

Eamon P. Kelly (*pro hac vice forthcoming*)
Joseph Vanek (*pro hac vice forthcoming*)
Alberto Rodriguez (*pro hac vice forthcoming*)
**SPERLING KENNY NACHWALTER**
321 North Clark Street, 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
Facsimile:  (312) 641-6492
Email: ekelly@sperlingkenny.com
Email: jvanek@sperlingkenny.com
Email: arodriguez@sperlingkenny.com

Phillip F. Cramer (*pro hac vice forthcoming*)
**SPERLING KENNY NACHWALTER**
1221 Broadway, Suite 2140
Nashville, TN 37203
Telephone: (615) 252-5800
Facsimile:  (615) 252-5853
Email: pcramer@sperlingkenny.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PURE SWEAT BASKETBALL INC., on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>APPLE INC., a California corporation,<br><br>               Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................................1

II.   JURISDICTION AND VENUE ..............................................................................3

III.  PARTIES .................................................................................................................4

IV.   RELEVANT FACTS ...............................................................................................5

    A.    Apple Commission Structure. ......................................................................5

    B.    Apple's Anti-Steering Rules and the Injunction Invalidating Them. ........6

    C.    Apple Recognized That the Injunction Would Benefit Developers
        by Substantially Reducing the Commissions They Pay to Apple for
        In-App Purchases. ........................................................................................7

    D.    Apple Purposefully Violated the Injunction to Illicitly Preserve a
        Billion Dollar Revenue Stream. ...................................................................8

    E.    Because Apple Made Linked-Out Payments Economically Non-
        Viable, Virtually No Developer Offered Them. ........................................13

    F.    Apple Has Been Held in Civil Contempt for Violating the
        Injunction and Referred to the US Attorney for Potential Criminal
        Prosecution. ................................................................................................14

    G.    Apple's Injunction Defiance Harmed Its Own Developers Above
        All Else. ......................................................................................................16

V.    CLASS ALLEGATIONS ......................................................................................17

VI.   APPLICABILITY OF CALIFORNIA LAW ........................................................19

VII.  CLAIMS FOR RELIEF ........................................................................................20

FIRST CAUSE OF ACTION: CAUSES OF ACTION SUPPORTING
    CONSTRUCTIVE TRUST ...................................................................................20

SECOND CAUSE OF ACTION: UNJUST ENRICHMENT/QUASI-
    CONTRACT ..........................................................................................................22

THIRD CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH
    BUSINESS EXPECTANCY .................................................................................23

PRAYER FOR RELIEF ...................................................................................................23

JURY TRIAL DEMANDED .............................................................................................24

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

For its suit against Defendant Apple Inc., Pure Sweat Basketball Inc., on its own behalf and that of all similarly situated developers, alleges as follows:

## I.     INTRODUCTION

1.     This case arises from Apple's willful violation of a nationwide injunction (hereafter the "Injunction") that was intended to expose Apple to more meaningful competition. This is conduct for which Apple has been found in civil contempt, sanctioned, and referred to the United States Attorney's Office for potential criminal prosecution.[1]

2.     The Injunction Apple defied was initially entered after a bench trial in 2021 and became effective after exhaustion of appeals on January 16, 2024. It enjoined Apple's use of certain "anti-steering" rules that prevented, among other things, app developers from competing with Apple on payments for in-app products—i.e., app enhancements, content, and other features sold for use within an app. For every in-app purchase a consumer makes, Apple charges the app developer uniform transaction fees (defaulting at 30%, and 15% under some programs). Ostensibly, Apple could face competition from developers themselves, who can sell in-app content from their own websites, where Apple charges no fees. But Apple's anti-steering rules effectively shut this down, making it exceedingly difficult for developers to communicate alternative payment options and discounts to drive customers to their websites.

3.     The 2021 Injunction Apple violated changed all this—or it was supposed to. It expressly authorized Apple's developers to use "links" within their apps directing customers to their websites where in-app products could be obtained. This was supposed to give consumers choice between payment options. And for developers, the Injunction held great promise because developers could save billions in revenues by doing processing their own payments (or using an external payments processor). These are funds developers could reinvest in their apps and operations.

4.     Apple's internal analyses—which have now come to light despite Apple's prolonged efforts to improperly cloak them in privilege—demonstrate that Apple immediately

---

[1] *See Epic Games v. Apple Inc.*, 4:20-cv-5640 (N.D. Cal.), ECF No. 1508 (Order dated April 30, 2025) ("Contempt Order").



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

saw the injunction as a threat to its bottom line, with a potential billion-dollar impact on its revenues. To neutralize the effect of the injunction and illicitly retain this revenue stream, Apple engaged in a series of contrivances for which it has now been held in contempt.

5. Knowing that linked-out payments would be "very attractive to developers," Apple penalized developers who sought to use them with fees that rendered this alternative payment vehicle "economically non-viable."[2] Were this not enough, Apple executives up to the highest levels (including Apple CEO Tim Cook) also worked on "scare screens" and other "frictions" purposefully designed to discourage linked-out payments, all while knowing that this was the very competitive payment alternative the injunction aimed to facilitate.

6. Apple's scheme worked as planned. Although the injunction has been in "effect" for over 15 months, Apple has been able to identify *only 34 developers* who have even applied to offer linked-out payments through their apps.[3] This represents an infinitesimal 0.025% of the 136,000 developers who offer apps through the App Store.

7. Apple's defiance of the injunction came home to roost through two evidentiary hearings, in which the presiding Court heard evidence, analyzed Apple internal business documents, and interrogated Apple's proffered rationale for its conduct. The Court ultimately held that Apple willfully violated the injunction to protect its revenues, and then "reverse engineered justification[s] to proffer to the Court" often with "lies on the witness stand."[4] The evidence showed that while one senior Apple executive "advocated that Apple comply with the Injunction," Mr. Cook ignored this advice and allowed others in "his finance team to convince him otherwise. Cook chose poorly."[5]

8. Apple's contempt is far from a victimless offense. In addition to undermining the judicial process, Apple's defiance of the Injunction has harmed Apple's developers. These are the app developers who populate Apple's App Store with innovative apps that give Apple's

---

[2] *Id.* at 16, 59.
[3] *Id.* at 45.
[4] *Id.* at 63, 59.
[5] *Id.* at 2.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

devices ever-evolving functionality and utility. Had Apple complied with the injunction as issued, Apple's own studies show that developers would have saved potentially billions in in-app purchase commissions. These are ill-gotten gains and Apple should not be permitted to retain them. If it does, Apple will have profited handsomely for violating a court order and scheming to retain revenues to which it had no legal entitlement. That is not an outcome the law, or principles of equity, permit.

9.    Apple should be made to disgorge its wrongful profit, and Developers are entitled to be made whole. That is what this lawsuit seeks to accomplish. On behalf of a proposed Class of developers harmed by Apple's conduct, Plaintiff Pure Sweat Basketball asserts claims for unjust enrichment, intentional interference with business expectancy, and constructive trust. Each of these rights of action commands that Apple relinquish the revenues it illicitly retained by violating the Injunction.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds $75,000, exclusive of costs and interests.

11.    This Court also has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed class consists thousands or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and, members of the class are dispersed across the United States with at least one member (including Plaintiff) being a citizen of a state different from Apple, which is a California corporation.

12.    This Court has personal jurisdiction over Defendant Apple, which is headquartered in this District. Apple has engaged in sufficient minimum contacts with the United States, this judicial district, and this State, and it has intentionally availed itself of the laws of the United States and this State by conducting a substantial amount of business throughout the State.

13.    This judicial district is a proper venue because Apple resides in this District and transacts affairs in this District. A substantial part of the events giving rise to Plaintiffs' claims

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

occurred in this District. This District is also specified in the Apple's Developer Program License Agreement ("DPLA") as the judicial district for resolution of disputes "arising out of or relating to [that] Agreement," to which Plaintiff and other developers are a party.

### III.   PARTIES

14.   **Plaintiff Pure Sweat Basketball Inc. ("Pure Sweat")** is an Illinois corporation, headquartered in Illinois. Pure Sweat offers cutting-edge online and in-app basketball training. Its apps are used by players across the country to train and improve their basketball skills. Pure Sweat currently publishes two apps in the App Store.

15.   First, Pure Sweat published Pure Sweat Basketball Workouts in 2020. The Workouts App allows users to build custom basketball workouts tailored to their game. The app features in-app subscription purchases. Pure Sweat, however, prefers to include links within the app so that users can pay for their subscription through Pure Sweat's own website using Stripe, an online payment processor, without having to pay Apple's commissions on in-app payments. Pure Sweat has been blocked from doing so by Apple and has instead had to offer subscriptions as in-app purchases while paying Apple's commissions.

16.   Second, Pure Sweat developed a new Pure Sweat Basketball app in September of 2023 with a library of education videos and workouts. Pure Sweat designed the app with links to pay for in-app content on Pure Sweat's website using Stripe. Apple rejected the app citing its App Guideline "3.1.1 Business: Payments – In-App Purchase."

17.   During a call on or about September 5, 2023, an Apple representative advised a representative of Pure Sweat that the app had been rejected because it contained links to purchase content outside of the app. The Apple representative advised that Pure Sweat had to remove external links and publish it as a reader app to get approved. Pure Sweat removed the links in order to gain Apple's approval of the app and publish it in the App Store. The App was published without any mechanism for in-app purchases.

18.   Pure Sweat intends to modify its apps to offer linked-out payments now that, by virtue of the Contempt Order entered on April 30, 2025, Apple is barred from imposing fees and other restraints on linked-out payments. Pure Sweat would have taken these steps promptly in

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    response to the Injunction, which became effective on January 17, 2024, had Apple complied

2    with the Injunction from day one and not imposed the economic and noneconomic restraints that

3    have now been set aside.

4        19.    **Defendant Apple Inc. ("Apple")** designs, manufactures and markets

5    smartphones, personal computers, tablets, and smart watches. Apple also sells a variety of

6    services, including the App Store, which distributes third-party apps to consumers, as well as an

7    in-app payment processing for digital goods purchased within apps. Apple maintains its

8    headquarters and principal place of business in Cupertino, California.

9               **IV.    RELEVANT FACTS**

10   **A.    Apple Commission Structure.**

11       20.    Much of the functionality available on Apple's devices is provided by third-party

12   developers who innovate a broad range of apps distributed through Apple's App Store. There are

13   two primary ways app developers can monetize their apps. They can charge an upfront fee to

14   download the app. Alternatively, or in combination with an upfront download fee, app

15   developers can charge for in-app content or enhancements to be utilized within an app. In-app

16   content comes in almost endless forms, from in-game purchases (e.g., enhanced armor, level

17   unlocks) to subscription services (e.g., digital subscriptions to publications like the *New York*

18   *Times* or streaming services like Netflix) to everything in between.

19       21.    Apple has historically maintained a highly uniform commission structure for the

20   sale of apps and in-app content. By default, Apple charges developers a 30% commission on app

21   downloads and in-app purchases. In more recent years, Apple has developed certain programs

22   whereby it charges 15% commissions, including a program for "small" developers (defined to

23   include developers earning $1 million or less from their apps),[6] and other 15% programs for

24   auto-renewing subscriptions and for certain developers offering video and news content ("Video

25   Partner Program" and "News Partner Program").[7]

26

27      [6] *See* App Store Small Business Program, available at: https://developer.apple.com/app-store/small-business-program/

28      [7] *See* Contempt Order at 43.

**HAGENS BERMAN**

22. Apple does not individually negotiate commissions with developers, and has historically imposed its standardized rates uniformly on all developers.

**B.    Apple's Anti-Steering Rules and the Injunction Invalidating Them.**

23. While Apple charges developers standardized commissions on in-app purchases, it historically has not categorically prohibited app developers from selling content consumable within an app from their own websites. On these sales, Apple has historically received no commission. To take an example, a developer may sell on their own website subscriptions for streaming content or digital currency that, after purchase, can be accessed from within an iOS or iPadOS app.

24. Although Apple permitted these out-of-app sales, for many years, Apple imposed certain "anti-steering" rules that made it very difficult for developers to encourage their customers to make purchases out-of-app.

25. Among other anti-steering restrictions Apple imposed were guidelines specifying that developers "may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase."[8] In other words, Apple's guidelines barred developers from embedding hyperlinks or other "buttons" within the payment flows of their apps directing customers to their own websites to complete the purchase of in-app content. Developers were also prohibited from using "calls to action" that would encourage their customers to use this alternative to Apple's in-app payments platform, including prompts apprising customers of discounts available on purchases completed on developers' websites.

26. Apple's anti-steering rules were held to violate California's Unfair Competition Law ("UCL") in *Epic Games v. Apple Inc.*, 4:20-cv-5640 (N.D. Cal.) ("Epic Games"). On September 10, 2021, the Court entered a nationwide injunction ("Injunction") prohibiting their enforcement. The Injunction provided:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ("Apple"), are hereby permanently restrained and enjoined from prohibiting

---

[8] *See Epic Games v. Apple Inc.*, 4:20-cv-5640, (N.D. Cal.), ECF No. 812 ("Injunction Order") at 30 (quoting former Section 3.1.1 of Apple's App Guidelines).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.[9]

27.    The Injunction was premised on the recognition that Apple's anti-steering rules prevented developers from engaging in the "most effective marketing activities" to reach their consumers, all to "Apple's own unrestrained gain."[10]

28.    The Injunction became effective on January 17, 2024 after Apple had exhausted all appeals.[11]

**C.    Apple Recognized That the Injunction Would Benefit Developers by Substantially Reducing the Commissions They Pay to Apple for In-App Purchases.**

29.    Apple's internal analyses recognized that the ability to direct customers to out-of-app payment options (hereafter "link-out payments"), which the Injunction authorized, would be "very attractive to developers" and "cause a lot of developers to adopt the link[-]out options." This would in turn "drive . . . spend outside of the app" where Apple does not charge a commission.[12] Apple estimated the revenue impact to be "***hundreds of millions to billions***" if developers were permitted to offer link-out payments to their customers.[13]

30.    The Injunction thus promised, on its face, a substantial redistribution of revenues from Apple to its developers. Under the prior regime, developers paid Apple a default 30% commission (15% under some programs) for in-app content. Under the Injunction, developers could use link-outs to drive their customers to alternative payment options where Apple did not charge commissions. Developers would bear some costs of processing payments made out-of-app, but the standard rate for external payment processing services generally falls around 4%, so the savings promised by the Injunction was enormous.

---

[9] *See Epic Games v. Apple Inc.*, 4:20-cv-5640, (N.D. Cal.), ECF No. 813 ("Permanent Injunction").

[10] Injunction Order at 163.

[11] Contempt Order at 10-11.

[12] *Id.* at 16.

[13] *Id.* (emphasis added).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

31.     Or that is what developers rightfully assumed. But as set forth below, Apple schemed from the moment the Injunction entered to evade compliance and nullify the Injunction's economic effect, all to the detriment of Apple's own developers.

**D.      Apple Purposefully Violated the Injunction to Illicitly Preserve a Billion Dollar Revenue Stream.**

32.     Recognizing link-out payments to be "very attractive to developers" and a billion-dollar threat to its revenues, Apple developed a strategy to discourage its developers from using link-out payments—that is, from engaging in the very customer steering practices the Injunction was designed to enable. Apple's Injunction noncompliance strategy had five components, taken in turn below.

33.     **Economic Penalties**: Although linked-out payments are processed on a developer's own website, Apple adopted new commissions to be imposed on any transaction facilitated through a link-out. The effect of these fees was to *increase* the fees developers paid for linked-out payments above Apple's default fees for in-app payments.

34.     Specifically, for developers paying Apple 30% commissions, Apple's new link-out fee was set at 27%. For developers paying 15% commissions, the link-out fee was set at 12%. Apple created these fees even though it was not performing the payment processing on these transactions. And while Apple's fees might appear to be a 3% discount off its default rates, they represented a fee increase to developers because any developer using linked-out payments would still need to pay roughly 4% in external payment processing fees to handle payments on their own websites.[14]

35.     As the Order holding Apple in contempt recognized, the evidence demonstrated that these economic restrictions "would effectively dissuade any real developer participation, to Apple's advantage."[15]

---

[14] Contempt Order at 17-18.
[15] *Id.* at 18.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

36.     While certain executives within Apple were concerned about Apple's ability to charge any fees under the Injunction,[16] their voices were drowned out because it would "make[] us less money."[17] Apple knew its fees "would not comply with the goal of the Injunction" and "would harm developers," yet Apple chose to impose them anyway, with Tim Cook providing the decisive vote.[18]

37.     **Arbitrary Restrictions on Link Placement and Design**: To make link-out purchases even less viable for developers, Apple imposed severe restrictions on where links could be placed and how they could be designed.

38.     With respect to placement, Apple prevented developers from putting a link-out to their websites "anywhere near the purchase flow" on their apps.[19] For example, if "an app has an item shop where a user could purchase a digital product—e.g., an in-game outfit or currency— nowhere in the shop could the external link appear."[20] Instead, Apple forced developers to put the link-out "on some other page within the app," which developers acknowledge inhibits their "ability to give users a choice in how to subscribe."[21] While Apple has asserted that this restriction on link placement was for security purposes, the Court—in holding Apple in contempt—scrutinized the evidence and found this to be "pretextual" and based on "nothing more than after-the-fact litigation posturing or outright misrepresentations to the Court."[22]

39.     As for design, Apple's Injunction noncompliance scheme required developers to use "plain link or button" style prompts (as in "Option 1" below), specifying that these "may not be enclosed in a shape that uses a contrasting background fill" (as in "Option 2" below) and that instead "the background surrounding text must match the background of [the] app's page"[23]:

---

[16] *Id.* at 20.

[17] *Id.* at 20 (quoting CS-538.2-3).

[18] *Id.* at 22, 23.

[19] *Id.* at 29.

[20] *Id.* at 30.

[21] *Id.*

[22] *Id.* at 31.

[23] *Id.* at 31-32 (quoting CX-3.5) (emphasis in original).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    40.    These were purposefully the "least visually prominent" prompts Apple could have

17  selected, and bore no resemblance to the "button" prompts users are accustomed to clicking on

18  within an app or website flow (e.g., the prompts depicted in "Option 2" above).[24] Apple selected

19  the least prominent option to discourage developers from using link-out payments. As Apple's

20  own internal analysis admitted: "How much can we limit what devs do with the text and

21  links?"[25]

22    41.    **Purchase-Flow Friction**: The third element of Apple's Injunction noncompliance

23  scheme was creating "friction" that would discourage customers from using linked-out payments

24  so that they would "cease to be advantageous for developers."[26] As Apple's internal documents

25  recognize, it is "very likely that when a link-out happens, there will be some breakage, meaning

26  _____

27    [24] *Id.* at 32.
      [25] *Id.* at 33.

28    [26] *Id.* at 34.

CLASS ACTION COMPLAINT - 10
011314-11/3192560 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    [the] customer drop[s] off during the buy-flow process due to a less seamless experience

2    compared to Apple's iAP [sic]."[27] Apple aimed to maximize this "breakage" to thwart the

3    Injunction.

4         42.    Apple accomplished this, first, with what it referred to as "scare screen"—a

5    prominent warning that would discourage consumers from linking out to developers' websites:



19         43.    Under this "scare screen," the entirety of the user's screen is taken over by a

20    warning page asking: "Are you sure you want to continue?" Apple employees who developed

21    this warning page openly pondered options that would "sound[] scary, so execs will love it."[28]

22    Internal Apple correspondence reveals that the objective was to make the message "scarier" and

23    draft language (that Apple did not use) was criticized because it "feels safe . . . like, don't worry,

24    you're still within the app and it's just guiding you somewhere else right now" when the

25    objective should be to convey that the users are being sent "into the great wide open."[29] Rather

26

     [27] *Id.*

27         [28] *Id.* at 36.

28         [29] *Id.* at 37-38.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

than include the app name in the prompt, which users would be familiar with, Apple also decided to use the developer's name because this would make the prompt "even worse."[30]

44.    The scare screen design was implemented at the highest levels of Apple, with Tim Cook offering specific language to be included.[31] The goal throughout the wordsmithing was to devise a message that would "deter[] users as much as possible from completing a linked-out transaction" so that Apple could "maintain its revenues."[32]

45.    To further increase friction, Apple prohibited developers from using link-outs with a "dynamic URL." Dynamic URLs are commonplace in app design, and tellingly, the only place Apple has prevented them is for linked-out transactions that might take revenue away from Apple's in-app payments platform.[33] A dynamic URL can minimize friction by (for example) identifying a user so that when she clicks on a link to the developer's website, she can be automatically logged into her account, streamlining payments.[34] Apple barred developers from using this common tool to degrade linked-out payments and further thwart the Injunction.

46.    **Arbitrary Limitations on Calls to Action**: The Injunction required that Apple permit developers to use "calls to action" within their apps. These are textual prompts that encourage users to take action that developers wish to promote, including purchasing goods for use in-app from the developer's own website.[35] Apple's internal analyses shows that, if developers were allowed to innovate the text for their own "call outs" and adapt it to their own customers, this would "foster competition against Apple's IAP by causing customer migration to developer websites."[36]

47.    Accordingly, Apple restricted this as well. Apple developed five bland call-out "templates" and prohibited developers from deviating from this restrictive, and purposely

---

[30] *Id.* at 36.
[31] *Id.* at 38.
[32] *Id.*
[33] *Id.* at 40.
[34] *Id.*
[35] *Id.* at 41.
[36] *Id.* at 42.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

ineffective, script. For example, while a developer may want to direct its users to "buy at all-time discounted prices here," Apple's prompts permit them only to say: "Lower price offered on [website]."[37] Apple recognized internally that, with additional information presented to them, customers might "migrate to the web."[38] So, as part of its larger Injunction noncompliance scheme, Apple simply prohibited its developers from offering that information, or anything beyond the dry, scripted language it authorized.[39]

48.    **Arbitrary Program Exclusions**: Apple's internal analyses recognized that very large developers—many of whom participate in Apple's 15% commission Video Partner Program ("VPP") and News Partner Program ("NPP")—would be particularly likely to use linked-out payments even if Apple charged arbitrary fees for linked-out payments.[40] Accordingly, to ensure the Injunction would be ineffective as to these developers as well, Apple adopted a rule that if they used linked-out payments, they would lose their 15% commission and be subject to Apple's default 30% rates.[41] In other words, Apple simply penalized these developers if they elected to use linked-out payments by doubling their commissions.

49.    Internally, Apple recognized that its stated rationale for doing this was "weak" and that the true objective was to ensure that no developers utilized the link-outs the Injunction was designed to facilitate.[42]

**E.    Because Apple Made Linked-Out Payments Economically Non-Viable, Virtually No Developer Offered Them.**

50.    Of the estimated 136,000 developers in the App Store, only 34 even applied to offer linked-out payments (as of May 2024), and the number who have offered such payments may be even less—given that 17 of these developers did not even offer in-app products when they applied (i.e., they had nothing to sell through links).[43]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 43.

[41] *Id.*

[42] *Id.* at 44.

[43] *Id.* at 45.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

51.     Thus, while the Injunction was designed to encourage link-out payments, which would substantially reduce the commissions developers pay to Apple, Apple's Injunction-defying scheme ensured this did not happen—not even remotely. Instead, Apple schemed to maintain the status quo, as if no Injunction had entered, retaining its billion dollar in-app payments revenue stream while depriving developers of the intended fruits of the Injunction.

**F.     Apple Has Been Held in Civil Contempt for Violating the Injunction and Referred to the US Attorney for Potential Criminal Prosecution.**

52.     Apple's Injunction noncompliance scheme delayed its reckoning, but it ultimately did not fool the presiding Court. After a series of hearings (first in May 2024 and then in February 2025), the Court held Apple in civil contempt and referred Apple to the United States Attorney for the Northern District of California for an "investigation against Apple" and potential criminal prosecution.[44]

53.     The Court found that, rather than comply with the Injunction in good faith, Apple "opted to construct a program that nullified the revenue impact of the Inunction by prohibiting any viable alternative."[45] In particular, while Apple had never imposed commissions on out-of-app transaction previously, to circumvent the Injunction "Apple willfully set a commission rate that in practice made all alternatives to IAP economically non-viable."[46] The Court evaluated Apple's rationale for imposing 12% and 27% fees on linked-out transactions, and could not "conceive of how any reasonable mind interpreting this Court's and the Ninth Circuit's orders would find that structure permissible, because it *forecloses competitive alternatives*. That appears to have been the point. Business documents reveal that the internal justification was to maintain the existing anticompetitive revenue stream."[47]

54.     The Court determined that Apple designed the link-out option to maximize "friction" and willfully thwart the Injunction. The effect was to replace the

---

[44] *Id.* at 78.

[45] *Id.* at 58.

[46] *Id.* at 59.

[47] *Id.* at 59-60 (emphasis in original).

HAGENS BERMAN

anti-steering provisions the Injunction prohibited with a mosaic of the same: an ensemble of requirements that significantly reduces developers' ability to steer consumers to any competitive, favorable alternatives. Nor was this accidental: Apple's sensitivity analyses of breakage reveal that Apple was modeling precisely the amount of friction needed in a transaction to ensure that link-out transactions were not viable for a developer. While Apple initially considered imposing some of these restrictions *as an alternative* to a commission, it decided to impose *all* restrictions *and* set a commission rate. In other words, Apple sought to secure its illegal revenue stream from every angle.[48]

55.     Concluding that Apple's defiance of the Injunction was willful and driven by a "motive to protect its illegal revenue stream and institute a new de facto anticompetitive structure," the Court held Apple in civil contempt.[49] The Court accordingly (and immediately) enjoined Apple from imposing restrictions it had adopted in violation of the Injunction—specifically, from:

- Imposing any commission or any fee on purchases that consumers make outside an app, and as a consequence thereof, no reason exists to audit, monitor, track or require developers to report purchases or any other activity that consumers make outside an app;

- Restricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app;

- Prohibiting or limiting the use of buttons or other calls to action, or otherwise conditioning the content, style, language, formatting, flow or placement of these devices for purchases outside an app;

- Excluding certain categories of apps and developers from obtaining link access;

- Interfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message apprising users that they are going to a third-party site; and,

- Restricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase.[50]

56.     In addition to holding Apple in civil contempt for violating the Injunction, the Court referred Apple to the US Attorney for the Northern District of California for potential

---

[48] *Id.* at 61 (emphasis in original).

[49] *Id.*

[50] *Id.* at 75-76.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    prosecution for criminal contempt. The Court took no position on whether criminal sanctions

2    should issue, but acknowledged this to be a vehicle through which punitive penalties could be

3    imposed to "deter future misconduct."[51]

4    **G.    Apple's Injunction Defiance Harmed Its Own Developers Above All Else.**

5        57.    Apple's scheme ensured that the Injunction had no effect when it became

6    operative on January 17, 2024, and will continue to be ineffectual until Apple completely lifts its

7    Injunction-defying restraints and brings itself into full compliance with the Court's contempt

8    Order.[52]

9        58.    For Apple, the unlawful delay preserved enormous illicit profits. As noted,

10   Apple's own studies indicate that timely compliance with the Injunction would have resulted in a

11   revenue impact of "hundreds of millions to billions."[53] These are not just funds Apple illicitly

12   retained. They are funds that Apple illicitly retained *from its own developers*.

13       59.    Absent Apple's potentially criminal misconduct, developers would have liberally

14   deployed link-out payments—as Apple's own studies predicted—to save potentially billions in

15   commissions. Rather than pay Apple its prevailing commission rates (30% by default and 15%

16   under some programs), developers could have immediately offered prominent link-outs designed

17   to maximize usage, directing consumers to developers' own websites where Apple can charge no

18   fee. By paying standard payment processing rates of approximately 4% per transaction, rather

19   than Apple's fees, developers would have retained substantial additional profits to reinvest in

20   their apps, their websites, and their operations to make them all more productive endeavors.

21       60.    Apple's conduct in defying the Injunction also deprived developers of the direct

22   line of communication with their customers that the Injunction was supposed to facilitate.[54] By

23   fostering direct communication and permitting developers to freely direct customers to their own

24   websites, the Injunction promised developers new avenues to deepen their users' engagement

---

[51] *Id.* at 78.

[52] It is unclear, as of the date of this Complaint, what steps Apple has taken to comply.

[53] *Id.* at 16.

[54] Contempt Order at 3 ("Apple will no longer impede developers' ability to communicate with users.").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and enhance their exposure to developers' products and promotions. This did not happen. While Apple should want its developers to succeed through direct engagement with their own customers, in the end, Apple was more committed to retaining the in-app purchase revenue the Injunction threatened.

61.    The Injunction also sought to stimulate competition by placing developers on a more equitable footing to compete with Apple's in-app purchase platform.[55] But as Apple knew from day one, that only works if developer link-out payments are economically viable for developers to offer and presented to users as a potential alternative to in-app purchase. Apple ensured this did not happen either, and the benefits to competition that the Injunction strived to secure remain unrealized.

62.    The Contempt Order, assuming Apple complies, effectuates the Injunction going forward. But as the Court recognized in sanctioning Apple, the Contempt Order does not undo the harm caused by Apple's willful noncompliance up to this point.[56] That harm was suffered overwhelmingly by developers and this action seeks to make them whole.

## V.    CLASS ALLEGATIONS

63.    Plaintiffs bring this proposed class action for damages, restitution and costs and fees pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

64.    Plaintiffs bring this action on their own behalf and on behalf of the following class:

> All developers of any iOS or iPadOS app that was (a) distributed through Apple's U.S. App Store and (b) offered in-app products (including subscriptions) for a non-zero price during the Class Period.

65.    For purposes of this Complaint, and subject to modification at class certification and otherwise[57], the Class Period encompasses January 17, 2024 (the effective date of the Injunction) through the date on which Apple fully complies with the Injunction.

---

[55] *Id.* at 27.

[56] *Id.* at 78 (noting that Apple has not yet been "deprived of the fruits of its violation").

[57] Plaintiffs reserve right to modify the class period based on discovery and otherwise, including any evidence that Apple's misconduct prevented the injunction from becoming effective prior to January 17, 2024.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

66.     Excluded from this proposed class are Defendant Apple; Apple's affiliates and subsidiaries; Apple's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

67.     **Numerosity:** The exact number of the members of the proposed class is unknown and is not available to the Plaintiff at this time, but upon information and belief, the class will consist of at least one hundred thousand developers.[58]

68.     **Commonality:** Numerous questions of law and fact are common to the claims of the Plaintiff and members of the proposed class. These include, but are not limited to:

a.     Whether Apple violated the Injunction;

b.     Whether Apple was unjustly enriched by its violation of the Injunction and, if so, in what amount;

c.     Whether Apple has tortiously interfered with the business expectancies of Plaintiff and members of the proposed class;

d.     Whether Plaintiff and members of the proposed class have been harmed, including by way of having paid Apple commissions they would not have paid but for Apple's violation of the Injunction;

e.     Whether Plaintiff and members of the proposed class are entitled to any declaratory or injunctive relief, and to their attorney's fees, costs, and expenses; and

f.     Whether Plaintiff and members of the proposed class are entitled to any damages or restitution and, if so, in what amount.

69.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed class. The factual and legal bases of Apple's liability are the same and resulted in injury to Plaintiff and all of the other members of the proposed class.

70.     **Adequate representation:** Plaintiff will represent and protect the interests of the proposed class both fairly and adequately. Plaintiff has retained counsel competent and

---

[58] Contempt Order at 45 (noting that there are approximately 136,000 developers in the App Store).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed class, and its interests do not conflict with the interests of the proposed class members it seeks to represent. Class counsel are qualified and best positioned to lead the representation of the proposed class.

71.    **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for complained of conduct were undertaken, there may be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for Apple. Certification of Plaintiff's proposed class would prevent these undesirable outcomes.

72.    **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VI.    APPLICABILITY OF CALIFORNIA LAW

73.    California law applies to the claims asserted by Plaintiff and the proposed class virtue of the choice-of-law provision in Apple's Developer Program License Agreement,[59] which states that "[T]his agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law." DPLA § 14.10.

74.    Furthermore, the unlawful and Injunction-thwarting conduct alleged in this complaint was effected, implemented, adopted, and ratified in the state of California, where

---

[59] *See* Apple Developer Program License Agreement (March 31, 2025), *available at* https://developer.apple.com/support/terms/apple-developer-program-license-agreement/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Apple maintains its U.S. headquarters. Upon information and belief, a substantial part of the conduct at issue took place in California, including meetings and communications through which Apple developed its scheme to frustrate implementation of the Injunction. California has a clear, substantial, legitimate, and compelling interest in applying its law to corporate citizen Apple's unlawful conduct that emanated from within California's borders.

## VII.    CLAIMS FOR RELIEF

75.    All claims for relief asserted below and herein arise from Apple's defiance of the Injunction, which was entered on September 10, 2021, and absent Apple's violations and purposeful efforts to thwart the Injunction, would have become effective on January 16, 2024.

### FIRST CAUSE OF ACTION:
### CAUSES OF ACTION SUPPORTING CONSTRUCTIVE TRUST

76.    Plaintiff repeats and reasserts every allegation above as if set forth herein in full.

77.    Plaintiff seeks relief on its own behalf and on behalf of each member of the proposed nationwide California law class described above, all of whom were intended beneficiaries of the Injunction.

78.    The Class is entitled to restitution from Apple's violation of the Injunction, which was entered on September 10, 2021, and absent Apple's violations and purposeful efforts to thwart the Injunction, would have become effective on January 16, 2024.

79.    The Injunction, as Apple internally recognized, would cause hundreds of millions or even billions of dollars in Apple transaction fees to be paid directly to class members, rather than Apple.

80.    In an effort to continue to collect and retain that unlawful income, Apple engaged in a series of contrivances, for which it has been held in contempt. Those actions alleged above were intentional and wrongful.

81.    As a result of this wrongful conduct, Apple continued to receive precisely the benefit that was to be paid to class members as a result of the Injunction—transaction fees to which it was not entitled.


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

82.     As established by the Injunction, Apple did not and does not have any right to those transactions fees.

83.     Apple has unjustly and unlawfully obtained and retained those transaction fees at the expense of the class members.

84.     Cal.Civ.Code § 2224 provides: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

85.     Apple's conduct in violating the Injunction and contempt of Court was a wrongful act.

86.     Apple's conduct in unjustly enriching itself to the detriment and at the expense of Plaintiff and class members was a wrongful act.

87.     Apple's conduct constitutes other wrongful acts as well.

88.     Plaintiff and class members had economic relationships with their customers that, pursuant to nationwide Injunction, would have resulted in the economic benefit of receiving direct customer payments without paying Apple's commission fees for in-app purchases.

89.     Apple knew of these relationships. In fact, Apple's efforts alleged above were purposefully designed to interfere with the development of direct payment relationships between class members and their customers. Apple's wrongful efforts to circumvent the Injunction were intended to disrupt these direct relationships between class members and their customers.

90.     Apple's efforts to circumvent the Injunction did, in fact, disrupt the expected business relationships between class members and their customers.

91.     Plaintiff and class members were injured by the in-app purchase commission fees paid to Apple and by being deprived of the direct engagement with their own customers that the Injunction was designed to foster.

92.     Apple's conduct imposed a substantial injury on Plaintiff and class members in the amount of the transaction fees wrongfully obtained by Apple in violation of the Injunction.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

93.     Apple's violation of the Injunction only benefited itself, frustrating the intent of the Injunction to inject competition into the market. The Injunction was intended to foster competition; Apple's violation of the Injunction thwarted that intent.

94.     Plaintiff and other class members were unable to avoid the effects of Apple's unfair and unlawful conduct. As this Court found, Apple willfully violated the Injunction and was willing to engage in contempt of court to harm Plaintiff and other class members.

95.     During the Class Period, Apple received transaction fees on in-app purchases because of its wrongful acts and refusal to abide by the Injunction, which makes Apple an involuntary trustee of those fees for the benefit of the class members who otherwise would have received that money.

**SECOND CAUSE OF ACTION:**
**UNJUST ENRICHMENT/QUASI-CONTRACT**

96.     Plaintiff repeats and reasserts every allegation above as if set forth herein in full.

97.     Plaintiff asserts this cause of action on its own behalf and on behalf of each member of the proposed nationwide California-law class described above.

98.     The Injunction, as Apple internally recognized, would cause hundreds of millions or even billions of dollars in Apple transaction fees to be paid directly to the developers, rather than Apple.

99.     To avoid losing that income, Apple engaged in a series of contrivances, for which it has been held in contempt. Those actions alleged above were intentional and wrongful

100.     As a result of this wrongful conduct, Apple continued to receive precisely the benefit that was to be paid to class members as a result of the Injunction—transaction fees to which it was not entitled.

101.     Those transaction fees were retained unjustly by Apple at the expense of the class members, who were directly injured by Apple's conduct, acts, or omissions.

102.     It would be unjust and inequitable to allow Apple to retain the benefits that were obtained as a direct result of its wrongful conduct, including, without limitation, the series of contrivances to "protect its illegal revenue stream and institute a new de facto anticompetitive



structure" that extracted hundreds of millions or even billions of dollars in Apple transaction fees from developers.

103.    Apple has been and will continue to be unjustly enriched by the transaction fees it wrongly charged developers for which restitution and disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Apple and its ill-gotten gains

### THIRD CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

104.    Plaintiff repeats and reasserts every allegation above as if set forth herein in full.

105.    Plaintiff asserts this cause of action on its own behalf and on behalf of each member of the proposed nationwide California-law class described above.

106.    Plaintiff and class members have economic relationships with their customers that, pursuant to nationwide Injunction, would have resulted in the economic benefit of receiving direct customer payments without paying Apple's commission fees for in-app purchases.

107.    Apple knew of these relationships. In fact, Apple's efforts alleged above were purposefully designed to interfere with the development of direct payment relationships between class members and their customers. Apple's wrongful efforts to circumvent the Injunction were intended to disrupt these direct relationships between class members and their customers.

108.    Apple's efforts to circumvent the Injunction did, in fact, disrupt the expected business relationships between class members and their customers.

109.    Plaintiff and class members were injured by the in-app purchase commission fees paid to Apple and by being deprived of the direct engagement with their own customers that the Injunction was designed to foster.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief on its own behalf and on behalf of all those similarly situated

A.    That the Court certify this case as a class action and that it appoint Plaintiff as class representative and its counsel as class counsel;

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

B.      That the Court award Plaintiff and the proposed class all appropriate relief, to include, but not be limited to, monetary relief by way of restitution, damages, and disgorgement of all profits unjustly received and retained by Apple during the Class period, punitive damages where mandated by law or equity or as otherwise available, and recovery of the costs of suit to include reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity.

C.      That the Court grant such additional orders or judgments as may be necessary to prevent and remedy the unlawful conduct complained of herein; and

D.      That the Court award Plaintiff and the proposed class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


DATED: May 2, 2025                    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**


By   _/s/ Ben M. Harrington_____
            BEN M. HARRINGTON (SBN 313877)

715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: benh@hbsslaw.com

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Steve W. Berman (*pro hac vice forthcoming*)
Theodore Wojcik (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com

Eamon P. Kelly (*pro hac vice forthcoming*)
Joseph Vanek (*pro hac vice forthcoming*)
Alberto Rodriguez (*pro hac vice forthcoming*)
**SPERLING KENNY NACHWALTER**
321 North Clark Street, 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
Facsimile:  (312) 641-6492
Email: ekelly@sperlingkenny.com
Email: jvanek@sperlingkenny.com
Email: arodriguez@sperlingkenny.com

Phillip F. Cramer (*pro hac vice forthcoming*)
**SPERLING KENNY NACHWALTER**
1221 Broadway, Suite 2140
Nashville, TN 37203
Telephone: (615) 252-5800
Facsimile:  (615) 252-5853
Email: pcramer@sperlingkenny.com

*Counsel for Plaintiffs and the Proposed Class*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX